**PEOPLE UNITED FOR CHILDREN, INC., et al., Plaintiffs,**

v.

**The CITY OF NEW YORK, et al., Defendants.**

**No. 99 Civ. 0648(RJW).**

United States District Court, S.D. New York.

July 18, 2000.

---

Center for Law and Social Justice, Brooklyn, NY by Joan P. Gibbs, Esmeralda Simmons, for Plaintiffs.

Michael D. Hess, Corporation Counsel of the City of New York, New York City by Donald C. Sullivan, for Defendants.

**Opinion**

ROBERT J. WARD, District Judge.

Plaintiffs brought this action under 42 U.S.C. §§ 1983 and 1988 alleging violations of their rights secured by the First, Fourth, Ninth, Thirteenth, and Fourteenth Amendments to the United States Constitution, and various provisions of the New York State Constitution and the Family Court Act. Defendants moved pursuant to Rule 12(b)(1), FED. R. CIV. P, for an order dismissing plaintiffs' complaint for lack of subject matter jurisdiction, and for federal court abstention. They have also moved pursuant to Rule 12(b)(6), FED. R. CIV. P, for an order dismissing plaintiffs' complaint for failure to state a claim upon which relief can be granted. For the reasons hereinafter stated, defendants' motion to dismiss pursuant to Rule 12(b)(1) and request for abstention are denied. Defendants' motion to dismiss pursuant to Rule 12(b)(6) is granted in part and denied in part.

## BACKGROUND [1]

### I. The Parties

Plaintiff People United For Children, Inc. ("People United") is a non-profit organization that was founded in 1983. It conducts a weekly support group for individuals who have lost custody of their children to the defendant Administration for Children's Services ("ACS"). The individual named plaintiffs, whose particular allegations are set forth below, are affiliated with People United. Defendants are the City of New York, Mayor Rudolph W. Giuliani, ACS and its predecessor agency, the Child Welfare Administration ("CWA"), and Nicholas Scoppetta, the Commissioner of ACS. ACS, like its predecessor CWA, is responsible for investigating and prosecuting incidents of child abuse and neglect.[2]

### II. Alleged System–Wide Deficiencies

Plaintiffs allege a number of system-wide deficiencies in ACS's administration of New York City's child welfare program. They contend that ACS fails to fully investigate allegations of child neglect and abuse against parents or legal guardians before removing children from their custody. This failure to investigate allegedly results from ACS' proclaimed policy of resolving "[a]ny ambiguity regarding the safety of a child . . . in favor of removing the child from harm's way," and returning children to their parents or guardians "[o]nly when families demonstrate to the satisfaction of ACS that their homes are safe and secure." First Amended Complaint at ¶ 37 ("Complaint"). According to plaintiffs, this failure to investigate deprives plaintiffs of their rights under the First, Fourth, Ninth, Thirteenth, and Fourteenth Amendments to the United States Constitution, and Article XVII of the New York State Constitution. Plaintiffs also allege that ACS fails to provide them with information concerning available procedures and programs which will assist them in regaining custody of their children in violation of various provisions of New York's Family Court Act. Furthermore, plaintiffs claim that ACS fails to adequately monitor and supervise other foster care providers which are subcontractors of ACS.[3]

In support of these general allegations, plaintiffs set forth the circumstances of a number of individuals who have allegedly been subjected to the challenged policies and practices of defendants.

### III. Allegations Regarding Individual Plaintiffs

Each of the individual plaintiffs is a parent or legal guardian who has been threatened with the removal of their children, or whose children have been removed and placed into the custody of CWA or ACS.

#### A. Candia Richards–Cantave and Joslin Richards–Cantave

The Richards–Cantave plaintiffs allege that in September 1998, two ACS caseworkers from the Bronx office of defendant ACS, Christopher Small and Chris-

---

**1.** The facts are taken from the First Amended Complaint and are assumed true for purposes of this motion. *See Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995).

**2.** In early 1996, Mayor Giuliani signed an Executive Order which abolished CWA and created ACS, New York City's first independent agency devoted entirely to administering the City's child welfare program. Commissioner Scoppetta was appointed to head ACS.

**3.** Plaintiffs allege that ACS's policies and practices have resulted in a vast increase in the number of children who have been removed by ACS from the custody of their parents or legal guardians. Plaintiffs provide the following statistics:

| Fiscal Year | Number of new children admitted into foster care |
| --- | --- |
| 1995 | 7,949 |
| 1996 | 8,912 |
| 1997 | 11,453 |
| 1998 | 12,536 |

Complaint at ¶ 37.

tine Reyes, came to plaintiffs' residence, reportedly to investigate a September 9, 1998 anonymous report that Mr. and Mrs. Richards–Cantave had left their six month old son at home for several hours while they were out selling drugs. Only Mrs. Richards–Cantave, her son, and her mother were home when the ACS caseworkers arrived.

During the course of his interrogation of Mrs. Richards–Cantave, Mr. Small asked to see records concerning her son's immunization. In response, Mrs. Richards–Cantave stated that her son was only six months old and that she and her husband had decided to delay having their son immunized because of their religious beliefs and concerns about the safety and efficacy of immunizations. In addition, Mrs. Richards–Cantave, who has a Masters Degree in Public Health and was employed as the Director of a health-related organization at the time of these events, explained that she was breast-feeding her son and that he was in no danger since the immunity he received from her lasts at least eighteen months. Mrs. Richards–Cantave also handed Mr. Small documents concerning her religious beliefs and the exemptions from the vaccination requirements.

In response to Mrs. Richards–Cantave's statements and presentation of supporting documents, Mr. Small stated, "in New York State all children have to be immunized. There are no exceptions or exemptions." Complaint at ¶ 52. Mr. Small and Ms. Reyes then told Mrs. Richards–Cantave that she should be charged with medical neglect and that her son should be removed from her custody because he was not immunized. Mr. Small also requested the name and telephone number of Mrs. Richards–Cantave's child's physician, which Mrs. Richards–Cantave provided.

The next day, Mr. and Mrs. Richards–Cantave obtained a letter from their child's physician stating that they were good parents and that their son was in good health. They then visited the Bronx ACS office accompanied by a social worker. Mr. and Mrs. Richards–Cantave spoke to Mr. Small's supervisor, Mr. Esere, who stated that it was not necessary for them to come to the office and that Mr. Small had stated that there was nothing to the case.

As they were leaving the ACS office, Mr. and Mrs. Richards–Cantave encountered Mr. Small. Contradicting his supervisor's statements, Mr. Small began talking about their alleged failure to immunize their son and stated that he had to talk to ACS lawyers about the case. During the course of the following week, Mr. Small called Mrs. Richards–Cantave on numerous occasions, both at work and at home, to inquire as to whether she was willing to have her son vaccinated. In response to threats that a court order would be obtained if she did not agree to vaccination, Mrs. Richards–Cantave repeatedly stated that there was no medical emergency and requested that her decision not to vaccinate her son be respected.

Subsequently, Mr. Small called Mrs. Richards–Cantave, this time to inform her that she and her husband were required to appear in Bronx Family Court on September 25, 1998. Mr. and Mrs. Richards–Cantave then obtained legal counsel and went to court on the date set. On the day of the hearing, Mr. and Mrs. Richards–Cantave were served with copies of an Article 10 petition, which contained charges of neglect filed against them. Despite being told that they would receive the papers prior to the hearing date, this was the first time that Mr. and Mrs. Richards–Cantave saw the petition. Once inside the courtroom, the ACS attorney informed the judge that ACS was withdrawing the petition.

## B. Khatira Hikmah

On or about April 25, 1996, an employee of ACS, accompanied by over a dozen members of the New York City Police Department ("NYPD"), knocked on Ms. Hikmah's door, demanding entry. When she asked why they were there, the ACS

worker stated that they were concerned about her and her granddaughter's health and welfare. Ms. Hikmah attempted to assure the ACS worker that she and her granddaughter were fine. When the police insisted that she open the door Ms. Hikmah asked if they had a warrant. They stated that they did not, and then proceeded to push in the door.

Based on the condition of her apartment, which was messy and contained a religious shrine, the ACS workers and the police concluded that Ms. Hikmah and her granddaughter were in danger. Ms. Hikmah was handcuffed and involuntarily taken to Harlem Hospital. Ms. Hikmah's granddaughter was also taken to Harlem Hospital for a pediatric examination. No signs of abuse or neglect were subsequently reported. After four days at Harlem Hospital, Ms. Hikmah was released when it was determined that she was neither a danger to herself nor anyone else.

### C. Khaliah Martin

In March, 1993, Ms. Martin's three children were taken from her custody by CWA, the predecessor agency to ACS. Ms. Martin's daughter was placed with her grandmother, and her two sons were placed in foster care. In November 1996, while she was incarcerated at Rikers Island, Ms. Martin's parental rights for her two sons were terminated in proceedings initiated by one of ACS's contract agencies. Ms. Martin was not present during these proceedings.

### D. Amanda Sherman

In August, 1995, Ms. Sherman, believing that her maternal granddaughter would only be temporarily removed, voluntarily placed her in the custody of CWA. CWA (or ACS) refuses to return Ms. Sherman's granddaughter to her despite Ms. Sherman's repeated requests and despite the fact that she has been taking care of her granddaughter's brother for over five years without incident. Ms. Sherman was never offered preventive services, in-

formed of the consequences of her actions, or informed of her right to have her granddaughter live with her under a "kinship" program.

### E. Theresa Logan

In the Fall of 1997, Ms. Logan's son and daughter were removed from her custody by ACS after the public school that her son attended reported that she refused to have him evaluated for placement in the special education program. Thereafter, the two children were placed in the custody of their maternal grandmother and subsequently their maternal aunt, with whom they remain. In June 1998, ACS wrote a letter to Ms. Logan requesting that she contact the office regarding counseling and parenting skills classes. The Complaint does not indicate whether Ms. Logan enrolled in any counseling or classes. Ms. Logan is able to visit her children but ACS refuses to return them to her custody or develop a meaningful family reunification plan.

### F. Lucille Delaphena and Jose Pena

In March 1993, Ms. Delaphena's and Mr. Pena's son and daughter were removed from their custody and placed in foster care by CWA after CWA received reports that Ms. Delaphena and Mr. Pena were using drugs. Following the removal of the children, ACS (or its predecessor CWA) failed to develop a meaningful family reunification plan, or advise plaintiffs about, or refer plaintiffs to, any programs that would assist them in obtaining custody of their children. Nevertheless, Ms. Delaphena enrolled in and successfully completed a drug treatment program as well as a program on parenting skills. Subsequently, Ms. Delaphena's and Mr. Pena's parental rights were terminated in proceedings initiated by ACS, or one of ACS's contract agencies.

### G. Agatha Sibley

In July 1997, Ms. Sibley's three grandchildren, two of whom were in her custody

pursuant to a court order, were removed from her custody by ACS without a court order and placed in foster care because Ms. Sibley had allegedly failed to provide one of her grandchildren with proper medical care and allegedly maintained her residence in an unsanitary and dangerous condition. For over four years prior to the removal of her grandchildren, Ms. Sibley had been fighting with her landlord over the condition of her apartment, but nothing was done. When Ms. Sibley told ACS about her landlord, ACS employees responded that she should have moved. Only after her grandchildren had been placed in foster care did Ms. Sibley receive any assistance with her apartment problems. Ms. Sibley's grandchildren have not yet been returned to her custody.

### H. Cherry McClamy

In April 1992, Ms. McClamy's son and daughter were removed from her custody by CWA following an allegation that she had physically abused her daughter. Since that time Ms. McClamy has successfully completed parenting skills courses and received therapy, but ACS has not yet returned her daughter to her custody.

### I. Lesley Marguerite Adams–Simien

On or about July 29, 1997, Ms. Adams–Simien's six year old daughter was removed from her custody by employees of ACS following allegations that Ms. Adams–Simien had inadequately supervised her daughter. Ms. Adams–Simien has completed a parenting skills course and is receiving therapy, but her daughter has not been returned to her custody.

### J. Concita Jones

Ms. Jones was accused of leaving her children alone on at least one occasion at a shelter. Subsequent to that event, her two children were removed from her custody without a court order based on an allegation that she failed to provide them with proper supervision and guardianship. Prior to their removal, Ms. Jones was not offered any preventive services by defendants. Ms. Jones' children have not yet been returned to her custody.

### K. Denise Johnson Burgess and James Burgess

On November 8, 1997, Ms. Johnson Burgess' and Mr. Burgess' four daughters and granddaughter were removed from their custody by employees of ACS and an unknown number of officers from the NYPD, following an allegation that Ms. Johnson Burgess and Mr. Burgess had neglected their six year old daughter. Ms. Johnson Burgess was taken to North Central Hospital and then to the Fifty–Second precinct police station. After several hours at the station, she was released and the charges against her were dropped. Her children have not been returned to her custody.

### DISCUSSION

### I. Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to the *Rooker–Feldman* Doctrine

Defendants argue that this action should be dismissed because the Court lacks subject matter jurisdiction over the case. In deciding such a motion pursuant to Rule 12(b)(1), FED. R. CIV. P., the Court must accept as true all material factual allegations in the complaint, but should refrain from drawing any inferences in favor of the party asserting jurisdiction. *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir.1992).

Defendants rely on the *Rooker–Feldman* doctrine to support their argument that the Complaint should be dismissed for lack of subject matter jurisdiction. The doctrine was first announced in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and was reaffirmed in *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). Under the *Rooker–Feldman* doctrine, this Court would "lack subject matter jurisdiction over a case if the exercise of jurisdiction

over that case would result in the reversal or modification of a state court judgment." *Hachamovitch v. DeBuono*, 159 F.3d 687, 693 (2d Cir.1998); *see also Moccio v. New York State Office of Court Admin.*, 95 F.3d 195, 198 (2d Cir.1996) (discussing the history and evolution of the *Rooker–Feldman* doctrine). Furthermore, *Rooker–Feldman* bars federal courts from considering claims that are "inextricably intertwined" with a prior state court determination. *See Feldman*, 460 U.S. at 482 n. 16, 103 S.Ct. 1303; *Hachamovitch*, 159 F.3d at 694. The doctrine is based on the notion that federal district courts have no power to review state court judgments because such power is reserved for the Supreme Court. *See Hachamovitch*, 159 F.3d at 693.

■ Defendants argue that the Court lacks subject matter jurisdiction under the *Rooker–Feldman* doctrine because the exercise of jurisdiction here would result in a reversal or modification of New York State Family Court judgments upholding the removal of plaintiffs' children. Plaintiffs counter that they are not seeking review of these Family Court proceedings, but rather, are challenging the general policies and practices of ACS.[4] For the reasons discussed below, the Court finds that it has subject matter jurisdiction over this case.

In *Feldman*, plaintiffs challenged District of Columbia rules which prevented them from sitting for the bar examination and being admitted to practice in the District of Columbia because they did not attend an accredited law school. The rules were promulgated by the District of Columbia Court of Appeals. Plaintiffs' petition to the Court of Appeals for a waiver of the rule in their particular cases was denied. 460 U.S. at 468, 103 S.Ct. 1303. Plaintiffs then filed complaints in the United States District Court for the District of Columbia challenging the Court of Appeals' denial. *Id.*

The Supreme Court held that the district court lacked subject matter jurisdiction over plaintiffs' attempt to seek review of the Court of Appeals' decision. *Id.* at 482, 103 S.Ct. 1303. However, the Supreme Court stated that, "[t]o the extent that [plaintiffs] mounted a general challenge to the constitutionality of [the] Rule ... the District Court did have subject-matter jurisdiction over their complaints." *Id.* at 482–83, 103 S.Ct. 1303. The Court based its ruling on the finding that such a claim would not be a challenge to a particular determination in a judicial proceeding, but rather, a challenge to rules promulgated by a judicial body in its non-judicial capacity. *See id.* at 485–86, 103 S.Ct. 1303.

Similarly, in *Hachamovitch*, plaintiff's medical license was suspended in a state administrative proceeding. He then filed a request with the New York State Appellate Division to reopen the administrative hearing, arguing that certain exculpatory evidence had been withheld. The Appellate Division denied plaintiff's request to reopen the administrative hearing, finding that he had no right to reopen the hearing under any statutory or regulatory provision. The Appellate Division also held that plaintiff's claim that exculpatory evidence was withheld was meritless because, *inter alia*, the right to exculpatory information afforded to defendants in criminal proceedings does not extend to administrative proceedings. *See* 159 F.3d at 692–93.

Plaintiff subsequently sued in federal district court under § 1983 alleging that the regulatory scheme violated due process insofar as it barred the reopening of a

---

4. Because defendants' challenge is to subject matter jurisdiction, the Court may consider materials extrinsic to the Complaint. *See United States v. Vazquez*, 145 F.3d 74, 80 (2d Cir.1998) (citing *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 948 F.2d 90, 96 (2d Cir.1991), *vacated on other grounds*, 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992)). To assist the Court in determining whether it has subject matter jurisdiction over this case, the parties have provided the Court with affidavits and other documents regarding the Family Court proceedings against plaintiffs.

concluded physician disciplinary proceeding and allowed the withholding of exculpatory evidence. The Second Circuit held that *Rooker–Feldman* did not prevent the district court from exercising jurisdiction over plaintiff's due process challenge to the unavailability of reopening procedures because the claim attacked "an alleged defect of state administration or legislation rather than adjudication," and because plaintiff challenged the procedures as they applied to all physicians, not just as they applied in his particular case. *Id.* at 694. However, with respect to plaintiff's claim that certain exculpatory evidence should have been admitted in his case, the court held that the Appellate Division actually decided that question against him, and therefore *Rooker–Feldman* barred relitigation of that question in the district court. *Id.* at 695–96.

Turning to plaintiffs in the present case, they do not ask this Court to sit in direct review of any state court proceedings. Plaintiffs were respondents in child neglect proceedings initiated by ACS in the New York Family Court, the purpose of which is to determine whether children are neglected or abused by their parents or guardians. Although there are pending or completed Family Court proceedings against many of the named plaintiffs, plaintiffs have not raised any claim that a particular finding of neglect or abuse by the Family Court was incorrectly made in their individual cases. Nor do plaintiffs challenge what occurred during the proceedings, such as the procedures used, or

the testimony given by witnesses. Rather, plaintiffs are challenging the constitutionality of ACS's system-wide policy of resolving any ambiguity in an abuse investigation in favor of finding that abuse has occurred as that policy applies to all parents and guardians of children who are removed by ACS, an issue not decided by the Family Court. *See e.g., Storck v. Suffolk County Dep't of Soc. Servs.*, 62 F.Supp.2d 927, 938–39 (E.D.N.Y.1999) (finding that *Rooker–Feldman* barred plaintiff's claims seeking review of a decision by a Family Court judge regarding testimony given in the Family Court proceedings, but not plaintiff's broader claims which challenged the constitutionality of a provision of the Family Court Act, and which alleged a conspiracy involving caseworkers and a county attorney). Therefore, the Court will not be sitting in direct review of the Family Court proceedings if it exercises subject matter jurisdiction over this case.[5]

This finding however does not end the Court's analysis under *Rooker–Feldman* because even if the Court is not being asked to sit in direct review of a state judicial proceeding, it lacks jurisdiction over any claims that are "inextricably intertwined" with decisions made in such proceedings. *See Hachamovitch*, 159 F.3d at 694 (citing *Feldman*, 460 U.S. at 482 n. 16, 103 S.Ct. 1303). The Second Circuit has stated that

> "the Supreme Court's use of 'inextricably intertwined' means, at a minimum,

---

**5.** Defendants cite *Murray v. Administration for Children's Services*, 98 Civ. 7356, 1999 WL 33869 (S.D.N.Y. Jan. 25, 1999), in support of their claim that *Rooker–Feldman* requires dismissal in this case. In *Murray*, the court relied on the *Rooker–Feldman* doctrine to dismiss plaintiff's claim that her child was removed without cause, reasoning that the court was being asked to reject the Family Court's finding that sufficient cause existed to justify the child's removal. *Id.* at *2. The court also rejected plaintiff's challenge to the Family Court's placement and visitation orders because it was being asked to directly overrule those orders. *Id.* Finally, the court

rejected plaintiff's claim that she was denied due process in the Family Court because it would amount to a prohibited review of the Family Court's decision on that issue. *Id.*

Unlike plaintiff in *Murray*, plaintiffs in the present case have not alleged that the Family Court made any erroneous decisions in their individual cases, and therefore, the Court will not have to take any action that will cause it to review or directly overrule the Family Court. As discussed above, they mount a general challenge to the system-wide policies and practices of ACS as they apply to numerous other individuals. Therefore *Murray* is not controlling.

that where a federal plaintiff had an opportunity to litigate a claim in a state proceeding (as either the plaintiff or defendant in that proceeding) subsequent litigation of the claim will be barred under the *Rooker–Feldman* doctrine if it would be barred under the principles of preclusion."

*Id.* at 695 (quoting *Moccio,* 95 F.3d at 199–200). There are two categories of preclusion that the Court must consider: res judicata (claim preclusion) and collateral estoppel (issue preclusion).

■ Under the res judicata doctrine, " '[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.' " *St. Pierre v. Dyer,* 208 F.3d 394, 399 (2d Cir.2000) (quoting *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981)). In considering whether res judicata bars the present action, the Court must consider: (1) whether the prior decision was a final judgment on the merits; (2) whether the present litigants were the same parties in the prior action; (3) whether the prior court was of competent jurisdiction; and (4) whether the causes of action were the same in the prior proceeding as those raised in the action in which res judicata is asserted. *See Corbett v. MacDonald Moving Servs., Inc.,* 124 F.3d 82, 87–88 (2d Cir.1997).

The Court finds that the third requirement, that the prior court be one of competent jurisdiction, is not met, and therefore, res judicata does not apply. In *King v. State Educ. Dep't,* 182 F.3d 162 (2d Cir.1999), plaintiffs sued in federal court for amounts they paid to defendants pursuant to orders of the New York Family Court. *Id.* at 162. Defendants moved to dismiss under *Rooker–Feldman* on the ground that the federal action was an attempt to obtain federal review of the Family Court orders. *Id.* at 162–63. The district court held that *Rooker–Feldman* did not bar the action because the Family Court did not have jurisdiction over plaintiffs' federal statutory claims. The Second Circuit recognized that the Family Court is a court of limited jurisdiction, which can only consider applications that are specifically enumerated in the New York State Constitution or an applicable statute. *Id.* at 163 (citations omitted). Finding that the Family Court had no jurisdiction to decide claims of rights arising under federal law in the context of proceedings to determine financial support for dependents, the court affirmed the district court's finding that *Rooker–Feldman* did not bar the suit. *Id.* at 163.

■ In the present case, the Family Court may be able to consider plaintiffs' federal constitutional claims, *see Reinhardt v. Commonwealth of Massachusetts Dep't of Soc. Servs.,* 715 F.Supp. 1253, 1257 (S.D.N.Y.1989) (stating that the Family Court is competent to hear and consider constitutional challenges), but the Family Court cannot afford plaintiffs the full measure of relief sought. Therefore, it is not a court of competent jurisdiction for purposes of this analysis. *See, e.g., Fay v. South Colonie Cent. Sch. Dist.,* 802 F.2d 21, 29 (2d Cir.1986) (stating that "[r]es judicata does not bar a claim based on the same cause of action ... if the forum that rendered the prior judgment 'did not have the *power* to award the full measure of relief sought' in a subsequent action") (emphasis in the original) (citations omitted); *accord Thomas v. New York City,* 814 F.Supp. 1139, 1148 (E.D.N.Y.1993).

Plaintiffs seek, *inter alia,* monetary damages, a declaration that defendants' policies and practices are unconstitutional, and a permanent injunction preventing defendants from continuing to implement the challenged policies and practices. The Family Court can entertain only those actions and award only that relief clearly provided for by the Family Court Act. *See Thomas,* 814 F.Supp. at 1148–49 (citing N.Y. Fam. Ct. Act § 115). In the context of the prior proceedings in this case, which were child protective proceedings under

Article 10 of the Act, the Family Court has the power to suspend judgment, release a child into the custody of her parents or legal guardians, place the child in another's care, issue an order of protection, and place the parent under the supervision of a relevant agency. *See* N.Y. FAM. CT. ACT § 1052. However, the Family Court does not have the power to award money damages. Furthermore, the Family Court cannot afford plaintiffs the full breadth of injunctive and declaratory relief they seek. Therefore, res judicata does not bar plaintiffs from bringing this action.

■ Turning to collateral estoppel, under New York law, the doctrine applies if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding. *See Moccio*, 95 F.3d at 200 (citing *Colon v. Coughlin*, 58 F.3d 865, 869 (2d Cir.1995)). The Court will turn first to whether the issues raised in this case were actually and necessarily decided in a prior proceeding.

■ After reviewing the Family Court records produced by the parties in response to the Court's request, the Court finds that the issues raised in the Complaint were not actually and necessarily decided in the Family Court proceedings. The Complaint alleges that defendants' policies and practices are unconstitutional and violate state statutory law because they encourage the removal of children from their parents or guardians without a court order where no emergency circumstances exist to justify their removal. Although the Family Court addressed the removal of plaintiffs' children in plaintiffs' individual cases, it did not consider the broader claims asserted here, which relate to the system-wide policies and practices of ACS.

The Court also finds that plaintiffs did not have a full and fair opportunity to litigate their present claims in the Family

Court proceedings. A determination as to whether the first action or proceeding genuinely provided a full and fair opportunity to litigate requires consideration of "the 'realities of the [prior] litigation', including the context and other circumstances which ... may have had the practical effect of discouraging or deterring a party from fully litigating the determination which is now asserted against him." *Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 501, 478 N.Y.S.2d 823, 467 N.E.2d 487 (1984) (citations omitted) (alterations in the original); *accord In re Sokol*, 113 F.3d 303, 307 (2d Cir.1997).

■ In engaging in this analysis, the Court should consider the nature of the forum and the importance of the claim in the prior litigation. *See In re Sokol*, 113 F.3d at 307; *Ryan*, 62 N.Y.2d at 501, 478 N.Y.S.2d 823, 467 N.E.2d 487. This consideration weighs in favor of finding that plaintiffs did not have a full and fair opportunity to litigate their claims in the Family Court. New York courts have recognized that parents' rights are subordinate to the purpose of child protective proceedings, *see In Matter of Tanya "T"*, 252 A.D.2d 677, 679, 675 N.Y.S.2d 237 (3d Dep't 1998), which is to protect the child from abuse and neglect. *See* N.Y. FAM. CT. ACT § 1011 (McKinney 1999). Because the Family Court is charged with the responsibility of protecting children from abusive parents and guardians, plaintiffs would not have a full and fair opportunity to litigate their constitutional claims in the Family Court, especially as they relate to the implementation of a system-wide policy and do not turn on facts unique to plaintiffs' individual cases.

Another consideration in determining whether plaintiffs had a full and fair opportunity to litigate in the prior proceedings is the incentive to litigate and the actual extent of litigation in the prior forum. *See In re Sokol*, 113 F.3d at 307; *Ryan*, 62 N.Y.2d at 501, 478 N.Y.S.2d 823, 467 N.E.2d 487. This factor also weighs in favor of finding that plaintiffs did not have

a full and fair opportunity to litigate their claims in the Family Court. As plaintiffs assert in their brief, "parents in proceedings under Article 10 of the Family Court Act are principally concerned with retaining or regaining custody of their children. Parents in such proceedings have little incentive to raise or even litigate constitutional claims, especially where doing so might disrupt or prolong the proceedings." Plaintiffs' Supplemental Memorandum in Response to the Court's October 7, 1999 Memorandum and Order, at p. 28. Therefore, the Court finds that plaintiffs did not have a full and fair opportunity to litigate their claims in the Family Court. Accordingly, collateral estoppel does not bar plaintiffs from bringing their claims in this Court.

In sum, the Court concludes that the *Rooker–Feldman* doctrine does not prevent the Court from exercising subject matter jurisdiction over plaintiffs' claims because this Court will not be sitting in direct review of any Family Court proceedings, nor will it have to consider matters that were inextricably intertwined with decisions made in those proceedings.

## II. Motion for Federal Court Abstention

■ Defendants ask this Court to refrain from hearing plaintiffs' claims under both the *Burford* and *Younger* abstention doctrines. As this Court stated in *Marisol A. v. Giuliani,* 929 F.Supp. 662 (S.D.N.Y. 1996), *aff'd,* 126 F.3d 372 (2d Cir.1997), "abstention is a doctrine to be applied only in rare and exceptional cases and, as a general rule, federal courts have a 'virtually unflagging obligation ... to exercise the jurisdiction given them.'" *Id.* at 687 (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). Furthermore, abstention in civil rights cases brought under § 1983 is particularly disfavored because such cases are meant to redress inadequate state law remedies. *C & A Carbone, Inc. v. Town of Clarks-*

*town,* 770 F.Supp. 848, 853 (S.D.N.Y.1991). With these guiding principles in mind, the Court will consider defendants' two abstention arguments in turn.

### A. *Burford v. Sun Oil Co.*

Defendants ask this Court to abstain from hearing this case under *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). The Supreme Court has identified two circumstances in which a federal court should abstain under *Burford:*

> (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*New Orleans Public Serv., Inc. v. Council of the City of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (quoting *Colorado River,* 424 U.S. at 814, 96 S.Ct. 1236, 47 L.Ed.2d 483). In determining whether a court should abstain because either of these two circumstances are involved, the Second Circuit has identified three factors that the Court should consider: "(1) the degree of specificity of the state regulatory scheme; (2) the need to give one or another debatable construction to a state statute; and (3) whether the subject matter of the litigation is traditionally one of state concern." *Hachamovitch v. DeBuono,* 159 F.3d 687, 697 (2d Cir. 1998) (citing *Bethphage Lutheran Service, Inc. v. Weicker,* 965 F.2d 1239, 1243 (2d Cir.1992)); *accord Planned Parenthood of Dutchess–Ulster Inc. v. Steinhaus,* 60 F.3d 122, 127 (2d Cir.1995) (citations omitted).

■ The first factor is not limited to determining specificity, rather it "focuses more on the extent to which the federal claim requires the federal court to *meddle* in a complex state scheme." *Hachamovitch,* 159 F.3d at 697 (emphasis in the

original). Here, plaintiffs' federal claims will not involve any "meddling" because they all turn on questions of federal constitutional law and will not require the Court to interfere with a state scheme. Furthermore, plaintiffs raise claims under provisions of the Family Court Act governing post child removal procedures. Although the Court will likely be required to confront issues raised under the Act, the state scheme governing child removals is not sufficiently complex to require abstention. *See, e.g., Planned Parenthood,* 60 F.3d at 127 (finding that abstention was not warranted where statutory scheme and regulations did not rise to "the requisite degree of complexity"). Therefore, the first factor weighs against abstention.

The second factor, the need to give one or another debatable construction to a state statute, is also not present here. With respect to plaintiffs' federal constitutional law claims, there will be no need to interpret any state statute because federal law governs their claims. Plaintiffs also allege violations of at least six sections of the Family Court Act, namely §§ 1017, 1022, 1023, 1024, 1026, and 1027. These sections create rules and procedures governing various stages of proceedings to remove a child. They "contain no broad terms requiring interpretation by a state agency or experts in the field," *Planned Parenthood,* 60 F.3d at 127 (citations omitted), nor will they give rise to "[c]onflicts in the interpretation of state law, dangerous to the success of state policies." *Burford,* 319 U.S. at 334, 63 S.Ct. 1098. Rather, they contain straightforward and clear rules that this Court is perfectly capable of interpreting and applying to the facts of this case. In short, they are not subject to debatable construction such that *Burford* abstention is warranted. Therefore, the second factor in the *Burford* analysis weighs against abstention.

The third factor requires the Court to consider whether the subject matter of the litigation is traditionally one of state concern. Although the Court recognizes New York's interest in child welfare matters, this factor alone does not tip the scale in favor of abstention when considered against the other two factors. *See, e.g., Planned Parenthood,* 60 F.3d at 127 (holding that *Burford* abstention was not warranted where New York had an interest in the subject matter of the litigation since the first two factors weighed against abstention). Therefore, defendants' request that the Court abstain on *Burford* grounds is denied.

**B.** *Younger v. Harris*

■ Defendants also ask this Court to abstain from hearing the claims of plaintiffs who are involved in pending Family Court neglect proceedings under the abstention doctrine set forth in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *Younger* and its progeny counsel that abstention " 'is warranted when there is an ongoing state proceeding involving an important state interest that provides the federal plaintiff with an adequate opportunity for judicial review of its federal ... claims.' " *Marisol,* 929 F.Supp. at 688 (quoting *Temple of Lost Sheep, Inc. v. Abrams,* 930 F.2d 178, 182 (2d Cir.), *cert. denied,* 502 U.S. 866, 112 S.Ct. 193, 116 L.Ed.2d 153 (1991)). Therefore, in determining whether abstention is warranted, the Court must ask: (1) whether there are ongoing state judicial proceedings; (2) whether those proceedings implicate an important state interest; and (3) whether the federal plaintiffs have an adequate opportunity in the state proceedings to raise their federal claims. *See Middlesex County Ethics Committee v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); *Christ the King Regional High School v. Culvert,* 815 F.2d 219, 224 (2d Cir.1987), *cert. denied,* 484 U.S. 830, 108 S.Ct. 102, 98 L.Ed.2d 63 (1987).

The first element of the *Younger* analysis is clearly satisfied in this case. There are ongoing Family Court proceedings against a majority of plaintiffs concerning

the custody of their children and numerous courts have found that ongoing Family Court proceedings satisfy the first *Younger* element. *See, e.g., Thompson v. Vacco*, 96 Civ. 8670, 1997 WL 539949, at *4 (S.D.N.Y. Aug. 29, 1997); *Thomas v. New York City*, 814 F.Supp. 1139, 1149 (E.D.N.Y.1993); *Reinhardt v. Commonwealth of Massachusetts Dep't of Soc. Servs.*, 715 F.Supp. 1253, 1255 (S.D.N.Y. 1989); *Thomas v. Beth Israel Hosp., Inc.*, 710 F.Supp. 935, 943 (S.D.N.Y.1989); *Donkor v. City of New York Human Resources Admin. Special Services for Children*, 673 F.Supp. 1221, 1225–26 (S.D.N.Y.1987).[6]

The Court also finds that the second *Younger* element, the importance of the state interest in the ongoing proceedings, is satisfied. It is well-established that state courts have a great interest in cases involving child custody and other family matters. *See, e.g., Moore v. Sims*, 442 U.S. 415, 435, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) ("Family relations are a traditional area of state concern."); *Neustein v. Orbach*, 732 F.Supp. 333, 341 (E.D.N.Y. 1990) ("[I]t hardly bears repeating that state courts have a paramount if not exclusive interest in child custody cases.").

■■ The more difficult question is whether the third *Younger* element is satisfied, that is, whether plaintiffs in this case have an adequate opportunity to raise their federal claims in the pending Family Court proceedings. Although the Court agrees that plaintiffs can make constitutional arguments in the Family Court, the Court does not agree that child neglect proceedings afford plaintiffs an adequate opportunity to raise their present claims.

While the Second Circuit has not addressed whether *Younger* abstention is appropriate under circumstances similar to this case, a decision of the District of Columbia Circuit Court of Appeals is instructive. In *La Shawn A. v. Kelly*, 990 F.2d 1319 (D.C.Cir.1993), *cert. denied*, 510 U.S. 1044, 114 S.Ct. 691, 126 L.Ed.2d 659 (1994), plaintiffs brought a class action law suit on behalf of children who were in foster care under the supervision of the District of Columbia Department of Human Services ("DHS") and children who were reported to be abused or neglected, but who were not yet in the care of DHS. Plaintiffs alleged a deprivation of their due process rights, and violations of federal and local statutory law. *Id.* at 1320–21.

One of the issues raised on appeal was whether the district court should have abstained under *Younger*. Like defendants in this case, defendants in *La Shawn A.* asserted that *Younger* applied to the claims of plaintiffs within the foster care system of the District of Columbia because they were parties to ongoing proceedings in the Family Division of the Superior Court (the "Family Division"), where their claims could have been resolved. *Id.* at 1322.

The District of Columbia Circuit found that *Younger* should not apply even though plaintiffs' claims could be raised in the Family Division because proceedings in the Family Division would be a "questionable vehicle for adjudicating the claims" raised by plaintiffs. *Id.* at 1323. The court analyzed three types of Family Division proceedings that could be "pending" for a child involved in the District of Columbia foster care system: (1) a "neglect proceeding" filed by the Corporation Counsel against the child's parents; (2) periodic review hearings; and (3) proceedings adjudicating motions to terminate parental rights. *Id.* The court concluded

---

6. State proceedings are pending for *Younger* purposes " 'until all appellate court remedies have been exhausted.' " *Neustein v. Orbach*, 732 F.Supp. 333, 341 (E.D.N.Y.1990) (citations omitted). Therefore, it appears that all named plaintiffs are parties in pending state court proceedings except the Richards–Cantave plaintiffs, whose Family Court action was dismissed by ACS. *See* Reply Declaration of Donald C. Sullivan in Further Support of Defendants' Motion to Dismiss or Abstain From Adjudicating the First Amended Complaint, attached to Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss Plaintiffs' Complaint or Abstain as Exhibit A.

that "[n]one of these proceedings is an appropriate forum for this multi-faceted class-action challenge to the District of Columbia's administration of its entire foster-care system." *Id.*

With regard to the first category of possibly pending cases, neglect proceedings, which are most analogous to the pending Family Court proceedings in this case, the court noted that such proceedings are "designed to focus on the special problems surrounding the neglect or abuse of a child by his or her parent, guardian, or custodian." *Id.* The District of Columbia Family Division itself recognized that such proceedings are not suitable to deal with broad issues external to the parent-child relationship, stating, " '[b]y their very nature neglect proceedings contemplate issues centering on the care of a child by his or her parent. If need be 'related matters involving the same family or household' can be consolidated.... Anything broader is inconsistent with the nature of the proceedings.' " *Id.* (quoting *In re N.P. and L.W.,* Nos. 404–79, 418–79 (D.C.Super. Ct. June 14, 1982), slip. op. at 2–3).

Similarly, this Court finds that neglect proceedings such as those in which plaintiffs in this case are involved are not suitable fora for plaintiffs to bring their present claims. Article Ten of the New York Family Court Act governs the neglect proceedings in which plaintiffs are involved. The primary purpose of Article 10 is "to establish procedures to help protect children from injury or mistreatment and to help safeguard their physical, mental, and emotional well-being." N.Y. FAM. CT. ACT § 1011.[7] After a child has been removed from his or her parents, the Family Court will engage in a "fact-finding hearing," which is defined as "a hearing to determine whether the child is an abused or neglected child as defined by this article." N.Y. FAM. CT. ACT § 1044.

Clearly, the question of whether there has been abuse and neglect will predominate in child protective proceedings. Therefore, the Court does not believe that the Family Court can adequately consider plaintiffs' claims in the context of a multi-faceted lawsuit challenging a system-wide policy rather than ACS's actions in individual cases.[8] It would be inappropriate and ineffectual to ask the Family Court to consider matters beyond those which are central to child neglect proceedings. First, matters collateral to the precise issue of neglect have the potential to detract the Family Court from the proper focus of the proceedings. Second, such collateral matters would not receive the attention they deserve because the nature of the proceedings require the court to focus on issues specific to the individual, and not on issues which potentially affect individuals not before the court.

Given the stated purpose and focus of child protective proceedings, it is not sur-

---

7. Another purpose of Article Ten is "to provide a due process of law for determining when the state, through its family court, may intervene against the wishes of a parent on behalf of a child so that his needs are properly met." N.Y. FAM. CT. ACT § 1011 (McKinney 1999). Although § 1011 does recognize the need to afford parents due process of law, it is merely a recognition that in individual neglect proceedings, parents retain certain constitutional rights, which this Court does not dispute. This does not contradict the Court's belief that the Family Court is not the appropriate place to adjudicate the present claims.

8. This Court does not question whether the Family Court would give plaintiffs' constitutional claims adequate consideration if they were raised in, and limited in scope to, their individual cases. *See, e.g., Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 431, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) ("Minimal respect for the state processes, of course, precludes any *presumption* that the state courts will not safeguard federal constitutional rights.") (emphasis in the original); *Reinhardt v. Commonwealth of Massachusetts Dep't of Soc. Servs.,* 715 F.Supp. 1253, 1257 (S.D.N.Y.1989) ("Clearly, the Family Court of New York is bound by the Federal Constitution. Thus, notions of comity and federalism compel the assumption that the Family Court is competent to hear and thoughtfully consider the plaintiffs' constitutional challenges.") (citations omitted).

prising that New York State courts have recognized that " 'the rights of a parent are subordinate to the purpose of Family Court Act article 10, which is to protect a child from a parent who is either unable or unwilling to discharge his or her parental responsibility properly.' " *In Matter of Tanya "T"*, 252 A.D.2d 677, 679, 675 N.Y.S.2d 237 (3d Dep't 1998) (quoting *Matter of Kathleen OO.*, 232 A.D.2d 784, 786, 649 N.Y.S.2d 193 (3d Dep't 1996)). Because child protective proceedings must focus on the narrow issue of the child's health, safety, and welfare in a particular case, they do not provide these plaintiffs with an adequate opportunity to raise their constitutional claims.[9]

Therefore, the Court finds that the third element of the *Younger* abstention doctrine is not satisfied in this case and defendants' request that this Court abstain on *Younger* grounds is denied.

### III. Motion to Dismiss for Failure to State a Claim

Defendants move to dismiss plaintiffs' Complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), FED. R. CIV. P. In deciding such a motion, the Court must accept as true the factual allegations set forth in the Complaint and must draw all reasonable inferences in plaintiffs' favor. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996). The Court, therefore, "may dismiss a complaint only if

it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon*, 467 U.S. at 73, 104 S.Ct. 2229 (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Further, " '[a] court must construe pleadings liberally, and mere vagueness or lack of detail does not constitute sufficient grounds for a motion to dismiss.' " *Marisol A. v. Giuliani*, 929 F.Supp. 662, 673 (S.D.N.Y.1996), *aff'd*, 126 F.3d 372 (2d Cir.1997) (citations omitted). In civil rights actions, courts must apply this standard with even greater force. *See Bernheim*, 79 F.3d at 321.

### A. Federal Constitutional Provisions

Plaintiffs allege a deprivation of their due process rights under the Fourteenth Amendment. The Complaint does not specify if the claim is based on substantive or procedural due process, but it can fairly be read as raising a claim under both doctrines. Furthermore, the parties addressed the motion to dismiss as if the Complaint raised claims under both. Therefore, the Court will address the motion under substantive and procedural due process principles.

### 1. Substantive Due Process

"Substantive due-process rights guard against the government's 'exercise of power without any reasonable justification in the service of a legitimate governmental objective.' " *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 1832, 146 L.Ed.2d 766 (2000) (citations omitted).

---

**9.** The Court is cognizant of the fact that there have been numerous cases challenging the practices of ACS and its predecessor agency which were dismissed under the *Younger* doctrine. *See, e.g., Phifer v. City of New York*, 99 Civ. 4422, 1999 WL 722013 (S.D.N.Y. Sept. 16, 1999); *Murray v. Administration for Children's Servs.*, 98 Civ. 7356, 1999 WL 33869 (S.D.N.Y. Jan. 25, 1999); *Thompson v. Vacco*, 96 Civ. 8670, 1997 WL 539949 (S.D.N.Y. Aug. 29, 1997); *Martinez v. Scoppetta*, 96 Civ. 7580, 1997 WL 316714 (S.D.N.Y. June 10, 1997); *Thomas v. Beth Israel Hosp.*, 710

F.Supp. 935 (S.D.N.Y.1989); *Donkor v. City of New York Human Resources Admin. Special Servs. for Children*, 673 F.Supp. 1221 (S.D.N.Y.1987). However, none of these cases dealt with a class action lawsuit or with allegations of systemic deficiencies in the way that ACS carries out its policy with respect to numerous other individuals. Rather, they involved individual plaintiffs alleging constitutional violations in the way that ACS acted in their particular cases. Therefore, the Court finds that these cases are not controlling here.

Only the most egregious official conduct is prohibited by substantive due process. "Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect or ill-advised.'" *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir.1995) (quoting *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir.1994)). Plaintiffs allege that they are deprived of their substantive due process rights because defendants' policies and practices encourage the removal of plaintiffs' children without justification. Defendants counter that each instance of removal was warranted by the existence of emergency circumstances.

■ The Court is guided in its analysis by the three-part test for evaluating substantive due process claims set forth in *Joyner v. Dumpson*, 712 F.2d 770 (2d Cir. 1983); *accord Yuan v. Rivera*, 48 F.Supp.2d 335, 347 (S.D.N.Y.1999); *Kia P. v. McIntyre*, 2 F.Supp.2d 281, 289 (E.D.N.Y.1998). First, the Court must examine the nature of the interest at stake to determine whether it is a fundamental right protected by the Fourteenth Amendment. Second, the Court must determine whether defendants' actions have significantly infringed that fundamental right. Third, the Court must analyze whether an important state interest justifies the infringement. *Joyner*, 712 F.2d at 777.

■ Turning to the first factor, the rights implicated by plaintiffs in this case are clearly fundamental. It is beyond dispute that the substantive due process clause protects an individual's liberty interest in familial relations, which includes a parent's interest in the custody of his or her children. *See Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d

551 (1972); *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.1996); *Hurlman v. Rice*, 927 F.2d 74, 80 (2d Cir.1991); *Duchesne v. Sugarman*, 566 F.2d 817, 824–25 (2d Cir.1977).[10] This protection is especially important where, as here, "we are concerned with the most essential and basic aspect of familial privacy-the right of the family to remain together without the coercive interference of the awesome power of the state." *Duchesne*, 566 F.2d at 825. The interest being protected is not only that of the "parent in the 'companionship, care, custody and management of his or her children,' [but also] of the children in not being dislocated from the 'emotional attachments that derive from the intimacy of daily association,' with the parent." *Id.* (citations omitted). Because plaintiffs in this case mount a direct challenge to defendants' actions in terminating the parent-child relationship, they have invoked their fundamental rights.

The Court finds that plaintiffs have also adequately alleged the second factor in the substantive due process analysis, that defendants have significantly infringed upon their fundamental interest. While courts have never articulated a bright-line rule to determine what type of infringement will be deemed significant, a review of cases involving similar circumstances provides guidance in determining what factors should be considered.

The extent of the deprivation is one indication of whether the infringement is significant. *See, e.g., Kia P.*, 2 F.Supp.2d at 290 (finding, as a matter of law, that plaintiffs' rights were not significantly infringed where defendants took no formal action to take custody of plaintiff's child, but merely held child pending the outcome of toxicology tests, and allowed parent to

**10.** Defendants acknowledge as much with respect to plaintiffs in this case who are biological parents. Def. Reply Br. at 12. To the extent that defendants suggest that plaintiffs who are legal guardians do not share the same liberty interest as biological parents, that suggestion has been rejected by the Su-

preme Court. *See Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 843 n. 49, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (stating that the familial interest in the custody, care, and nurture of the child extends beyond natural parents to legal custodians).

visit with the child). Furthermore, the Court should look at the length of the deprivation. *Compare Tenenbaum,* 193 F.3d at 600–01 (2d Cir.1999) (stating that deprivation for a single afternoon for purposes of a medical examination was not severe enough to constitute a violation of parents' substantive due process rights), *with Yuan,* 48 F.Supp.2d at 347 (finding that a separation for approximately three months constituted a significant infringement).

■ The Court finds that plaintiffs in this case have alleged that they have suffered a significant infringement. Plaintiffs allege that their children were removed from their custody, and have not been returned, constituting periods of deprivation ranging from over one year to over seven years.[11] Furthermore, several of the deprivations have resulted in a complete separation of parent and child, without the benefit of visitation or any other interaction. Based on these factors, the Court finds that plaintiffs adequately allege a significant infringement upon their liberty interest in the parent-child relationship.

The third prong of plaintiffs' substantive due process claim, that no significant state interest justifies the infringement, has also been satisfied. The Court recognizes that defendants have an important state interest in protecting children from abuse in emergency circumstances, and therefore, are justified in depriving plaintiffs of their fundamental liberty interest in cases where there is an objectively reasonable basis for believing an emergency situation exists. *See, e.g., Gottlieb,* 84 F.3d at 518 ("Where ... there is an objectively rea-

sonable basis for believing that parental custody constitutes a threat to the child's health or safety, government officials may remove a child from his or her parents' custody at least pending investigation.") (citations omitted); *Cecere v. City of New York,* 967 F.2d 826, 830 (2d Cir.1992) ("[T]emporary assertions of custodial authority in the face of a reasonably perceived emergency do not violate due process.").

■ However, the crux of plaintiffs' Complaint is that defendants are removing children from their parents' or guardians' custody without a reasonable basis to believe that such emergency circumstances exist. Plaintiffs allege that "defendants have adopted and are presently pursuing policies, practices, customs and procedures pursuant to which children are removed from the custody of their parents and other legally responsible persons and placed in foster care in cases where there is 'no imminent danger to the child's life or health.'" Complaint at ¶ 39. If this allegation proves true, it would entitle plaintiffs to relief under substantive due process principles.[12] Therefore, defendants' motion to dismiss plaintiffs' substantive due process claim is denied.

### 2. Procedural Due Process

To the extent that plaintiffs attempt to allege that their procedural due process rights were violated, they appear to contend that defendants removed their children in non-emergency circumstances without a pre-deprivation hearing. Defendants counter that no pre-deprivation hearing was warranted because emergency

---

11. There is one clear exception to this finding. The child of the Richards–Cantave plaintiffs was never removed from their custody. After ACS instituted an action against the Richards–Cantave plaintiffs, the petition was withdrawn. Therefore, the Richards–Cantave plaintiffs have failed to state a substantive due process claim.

12. The Court notes that, in most of the cases where courts have found an "objectively rea-

sonable basis" for removing children from their parents' custody in emergency circumstances, it was on a motion for summary judgment, and therefore, there was a record before the courts on which they could evaluate whether such circumstances existed. *See, e.g., Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996); *Cecere v. City of New York,* 967 F.2d 826, 827 (2d Cir.1992).

circumstances existed to justify the removal of plaintiffs' children without a hearing.

■ A determination of whether plaintiffs have stated a procedural due process claim is based on a two-part inquiry: first, whether they have asserted a liberty interest which receives Fourteenth Amendment protection; and second, whether the procedures utilized by defendants when interfering with that interest meet constitutional requirements. *See, e.g., Smith v. Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 847, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) ("OFFER"); *Rivera v. Marcus,* 696 F.2d 1016, 1022 (2d Cir.1982); *Yuan,* 48 F.Supp.2d at 344.

As discussed above, it is clear that plaintiffs have asserted a liberty interest which receives Fourteenth Amendment protection. *See, e.g., Kia P.,* 2 F.Supp.2d at 290 ("The liberty interests of parent and child in continued care and companionship has both procedural as well as substantive elements.") (citing *van Emrik v. Chemung County Dep't of Soc. Servs.,* 911 F.2d 863, 865 (2d Cir.1990); *Gottlieb,* 84 F.3d at 518–22; *Schwimmer v. Kaladjian,* 988 F.Supp. 631, 640 (S.D.N.Y.1997), *aff'd,* 164 F.3d 619 (2d Cir.1998)).[13]

The Court must now determine what process is due to plaintiffs whose children were removed from their custody. "As a general rule ... before parents may be deprived of the care, custody or management of their children without their consent, due process-ordinarily a court proceeding resulting in an order permitting removal-must be accorded to them." *Tenenbaum,* 193 F.3d at 593 (citations omitted). "A parent may not lawfully be deprived of the custody of his or her child without a hearing 'at a meaningful time and in a meaningful manner.'" *Gottlieb,* 84 F.3d at 520 (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14

L.Ed.2d 62 (1965)). However, "government officials may remove a child from his or her parents' custody before a hearing is held where there is an objectively reasonable basis for believing that a threat to the child's health or safety is imminent." *Id.* (citing *Cecere,* 967 F.2d at 829; *Hurlman,* 927 F.2d at 80; *Robison v. Via,* 821 F.2d 913, 921–22 (2d Cir.1987); *Duchesne,* 566 F.2d at 826).

■ Plaintiffs concede that the procedures provided for in the Family Court Act governing child removals in non-emergency circumstances are adequate to protect their due process rights. However, they allege that because defendants erroneously found that emergency circumstances existed to remove the children without a hearing, they deprived plaintiffs of the benefit of these procedures. Although defendants assert that emergency circumstances did exist, their argument is contradicted by the allegations in the Complaint, which must be assumed true for purposes of this motion. Based on these allegations, defendants were required to grant plaintiffs a pre-deprivation hearing as provided for in the Family Court Act. Because plaintiffs were denied such a hearing, they have stated a claim that they were deprived of their procedural due process rights and defendants' motion to dismiss that claim is denied.

### 3. Equal Protection

"To state a claim for an equal protection violation, [plaintiffs] must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender." *Hayden v. County of Nassau,* 180 F.3d 42, 48 (2d. Cir.1999). There are several ways that plaintiffs can demonstrate intentional discrimination by defendants. First, plaintiffs may allege that defendants' laws or

---

**13.** Like their substantive due process claims, the Richards–Cantave plaintiffs have failed to state a claim for a deprivation of their procedural due process rights because they have not asserted a liberty interest which receives Fourteenth Amendment protection. *See supra* n. 11.

policies are discriminatory on their face because they expressly classify persons on the basis of race. *Id.* (citing *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 213, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)). Second, plaintiffs may allege that a law that is facially neutral violates equal protection because it is being applied in a discriminatory fashion. *Id.* (citing *Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). Third, plaintiffs may allege that a facially neutral statute was motivated by discriminatory animus and its application results in a discriminatory effect. *Id.* (citing *Village of Arlington Heights v. Metropolitan Hous., Dev. Corp.,* 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)); *see also Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

Plaintiffs do not allege that defendants are acting pursuant to any facially discriminatory policy. Rather, they allege that defendants are carrying out their neutral policy in a manner that results in a discriminatory effect on African American parents and guardians. Therefore, in order to survive defendants' motion to dismiss, plaintiffs "must sufficiently allege that ... defendants harbored a discriminatory intent against them and that [defendants' policies] disproportionately impacted them." *Hayden,* 180 F.3d at 50.

■ In showing that defendants harbored a discriminatory intent against them, plaintiffs need not show that the decisionmaker was motivated solely, primarily, or even predominantly by race. *See United States v. Yonkers Bd. of Educ.,* 837 F.2d 1181, 1216–17 (2d Cir.1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988) (citing *Village of Ar-*

*lington Heights,* 429 U.S. at 265, 97 S.Ct. 555). It is enough if plaintiffs show that race was one of several possible motivating factors for defendants' actions. *Id.* at 1217 (citing *Village of Arlington Heights,* 429 U.S. at 266, 97 S.Ct. 555).[14]

■ As proof that defendants' actions in this case were at least partially motivated by race, and to establish the "disproportionate impact" element of their Equal Protection claim, plaintiffs provide statistics showing the effect that defendants' policies and practices have had on African Americans. This statistical disparity alone would be insufficient to establish intentional discrimination at trial. "[E]ven when a neutral law has a disproportionately adverse effect on a racial minority, the Fourteenth Amendment is violated only if a discriminatory purpose can be shown." *Crawford v. Bd. of Educ.,* 458 U.S. 527, 538–39, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982). However, "the racially disproportionate effect of official action provides an important starting point." *Id.* at 544, 102 S.Ct. 3211 (citations and internal quotations omitted); *see also Washington,* 426 U.S. at 253–54, 96 S.Ct. 2040 (Stevens, J., concurring) (arguing that the line between discriminatory purpose and discriminatory impact is not a bright line, and stating that evidence of disproportionate impact, when it is dramatic, is frequently the most probative evidence of discriminatory intent).

Plaintiffs point out that a vast majority of children in foster care in New York City are African American, and that the likelihood of remaining in foster care is much greater for an African American child than for a white child. Their Complaint cites the following statistics: as of June 1, 1997, there were 41,987 children in foster care in

14. Once plaintiffs show that their race was one of several possible motivating factors for defendants' actions, the burden shifts to defendants to show that the same result would have been reached even without considering race. *See United States v. Yonkers Bd. of Educ.,* 837 F.2d 1181, 1216–17 (2d Cir.1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988) (citing *Village of Ar-*

*lington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 270 n. 21, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). This portion of the Equal Protection analysis is inappropriate at the motion to dismiss stage because the parties have not yet engaged in any significant discovery.

New York City, of which, an estimated three percent were white and less than twenty-four percent were Latino, while seventy-three percent were African American; African American children are more than twice as likely as white children to be removed from their parents or guardian following a confirmed report of abuse and neglect; one out of every twenty-two African American children City-wide are in foster care, compared to one out of every 385 white children; in Central Harlem, a community historically and still primarily populated by African Americans, one out of every ten children is in foster care; while one out of every four African American foster children remains in foster care five years or more, only one in ten white children remains in foster care that long. *See* Complaint at ¶ 38.

In addition, plaintiffs make other allegations in their Complaint which also raise an inference of intentional discrimination. For example, plaintiffs allege that defendants have discriminated against African Americans by failing to take into account the cultural traditions and practices of African Americans when they investigate allegations of child abuse or neglect. Complaint at ¶¶ 62, 66. Furthermore, plaintiffs allege that "[d]efendants, by the above discriminatory actions, have violated and con-

tinue to violate the rights of plaintiffs and the class they represent ... to be free from discrimination on the basis of their race and color under the Thirteenth and Fourteenth Amendments to the Constitution of the United States." Complaint at ¶ 101. Although the Complaint is vague as to which "above discriminatory actions" plaintiffs refer, plaintiffs appear to be alleging that defendants are especially likely to assume that abuse has occurred where the parents or guardians they are investigating are African American.

■ These allegations, along with the statistical disparity alleged by plaintiffs, are sufficient to survive defendants 12(b)(6) motion.[15] Therefore, defendants' motion to dismiss plaintiffs' equal protection claim is denied.

### 4. Religious Discrimination

Plaintiffs allege that defendants discriminated against them based on their religion. It is unclear whether plaintiffs are attempting to state a claim under the Free Exercise Clause or the Equal Protection Clause. The Court has therefore considered the Complaint under both and finds that in either case plaintiffs have failed to state a claim upon which relief can be granted.[16]

---

**15.** The Court rejects defendants' argument that plaintiffs have failed to state a claim under the Equal Protection Clause because they have failed to allege that they were treated differently than those who were similarly situated. *See* Def. Br. at 17. While plaintiffs do not explicitly state that they were treated differently than similarly situated individuals, they do present statistical evidence of the disparities between African American and white individuals who come into contact with the foster care system. Such evidence implies that plaintiffs were treated differently than other similarly situated individuals. *See, e.g., Pisello v. Town of Brookhaven*, 933 F.Supp. 202, 211 (E.D.N.Y.1996) (finding that allegations that plaintiffs were targets of a campaign of prejudicial treatment necessarily implied that other similarly situated enterprises were not subject to the same harassment).

**16.** Although defendants did not address plaintiffs' religious discrimination claim in their

initial brief, the notice of motion defendants filed with the Court indicated that they were moving to dismiss the entire Complaint for failure to state a claim upon which relief can be granted. Presumably anticipating that defendants were also moving to dismiss plaintiffs' religious discrimination claim even though defendants did not brief the issue, plaintiffs argued in their response brief that the Complaint adequately pleaded such a claim. Defendants then addressed the claim in their reply brief. Thus, unlike defendants' motion to dismiss plaintiffs' claim under Article XVII, § 1 of the New York State Constitution and statute of limitations argument, *see infra* n. 20 and n. 21, the Court has received sufficient briefing to decide plaintiffs' religious discrimination claim at this time and neither party will be prejudiced by disposition of this issue without further submissions.

### a. Free Exercise Clause

■ The Free Exercise Clause prohibits the government from enacting a law or regulation that discriminates against religious beliefs or regulates conduct because it is undertaken for religious reasons. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (citations omitted). A law or regulation that facially targets religion is invalid unless it is justified by a compelling governmental interest and is narrowly tailored to advance that interest. *Id.* at 533, 113 S.Ct. 2217. However, a law or regulation that is neutral and of general applicability is constitutional even if it has an incidental effect on religion. *See generally Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

■ Plaintiffs in this case have failed to state a violation of the Free Exercise Clause. The challenged policy in this case is facially neutral and of general applicability. This is not determinative because the Free Exercise Clause " 'forbids subtle departures from neutrality,' and 'covert suppression of particular religious beliefs,' " *Hialeah*, 508 U.S. at 534, 113 S.Ct. 2217 (internal citations omitted). However, plaintiffs have failed to allege that ACS departed from the policy's neutrality or that ACS's policies and practices are applied in a way that results in a suppression of plaintiffs' religious beliefs.

Indeed, the Complaint does not even identify what religious beliefs plaintiffs hold. Plaintiffs merely state in conclusory terms that defendants' policies and practices violated plaintiffs' religious and cultural rights. *See* Complaint at ¶ 122. It is entirely unclear what the connection is between the policies and practices of defendants and the alleged violation of plaintiffs' religious and cultural rights. Although the allegations with respect to two of the named plaintiffs mention religion, *see* Complaint at ¶¶ 51, 52, 62, 64, plaintiffs have not alleged facts to support a finding that their religion was taken into account by defendants when they removed plaintiffs' children.[17] Therefore, the Court finds that plaintiffs have failed to state a claim under the Free Exercise Clause.

### b. Equal Protection

For similar reasons, plaintiffs have failed to state an equal protection claim based on religion. In order for plaintiffs to state an equal protection claim, they must allege that they were intentionally discriminated against on the basis of a protected classification, in this case, religion. *See Hayden*, 180 F.3d at 48. As with plaintiffs' Free Exercise claim, it is impossible for the Court to find that defendants intentionally discriminated against plaintiffs because of their religion.

In *Wilder v. Bernstein*, 499 F.Supp. 980 (S.D.N.Y.1980), this Court addressed the sufficiency of a complaint alleging an equal protection violation on the basis of race and religion and concluded that the claims, although "somewhat general," were "surely adequate to fulfill their chief purpose, to apprise defendants of the nature and scope of plaintiffs' claims." *Id.* at 990 (citations omitted). The same cannot be said of the Complaint in the present case. Even the "somewhat general" allegations in *Wilder* were substantially more specific than those currently before the Court. For example, in *Wilder*, plaintiffs claimed:

(1) that they were denied appropriate placement because they were black and Protestant; (2) that the defendant public

---

17. To the extent that the Richards–Cantave plaintiffs objected to the immunization of their son based on their religious beliefs, defendants are correct to point out that the Complaint does not allege any adverse action taken against the Richards–Cantave plaintiffs in violation of their religious beliefs. ACS withdrew its petition against them before the proceedings in the Family Court began. Furthermore, ACS never required that the Richards–Cantave plaintiffs immunize their son in violation of their religious beliefs, nor removed him for the assertion of those beliefs.

officials engage in and have actual knowledge of practices by which black Protestant children are denied equal access to services and receive segregated services; (3) that the defendant agency administrators engage in a policy, pattern and practice of religious discrimination in admissions decisions; and (4) that defendants' actions, in interpreting and implementing the challenged laws, necessarily and foreseeably result in racial and religious discrimination.

*Id.* (citations omitted). The Complaint in the present case is woefully inadequate when compared to the "somewhat general" allegations in *Wilder.* In the present case, plaintiffs allege:

The policies and practices of the defendants in removing children from the custody of their parents and other persons legally responsible without prior notice, without being informed of their rights and without a judicial hearing or any opportunity to otherwise be meaningfully heard violate plaintiffs and the class they represent religious and cultural rights under the First and Fourteenth Amendments to the Constitution of the United States.

Complaint at ¶ 122. Merely stating that defendants have violated plaintiffs' rights to be free from discrimination on the basis of religion does not establish an equal protection violation because there are no facts alleged in the Complaint to support the claim that defendants' policies and practices amounted to religious discrimination. Unlike their equal protection claim regarding race, plaintiffs have not provided any information, such as statistical data, which could provide the Court with a starting point in evaluating whether plaintiffs have stated an equal protection claim based on religion. Nor have they even suggested that animus towards plaintiffs' religion was a motivating factor for defendants' actions.

In sum, even interpreting the Complaint liberally, the Court finds that plaintiffs have failed to state a claim for religious discrimination under either the Free Exer-cise Clause or Equal Protection Clause, and therefore, defendants' motion to dismiss these claims is granted.

## 5. Search and Seizure

The parties dispute the nature of plaintiffs' Fourth Amendment claim. Defendants assert that custodial parents have no Fourth Amendment search and seizure claim independent of the liberty interest in family unity because the parent is not the subject of the search or seizure. Plaintiffs, on the other hand, argue that their Complaint challenges defendants' policies and practices of using coercion to gain entry into plaintiffs' homes without a warrant where no emergency circumstances exist, and therefore, that plaintiffs are the subject of the allegedly unconstitutional action.

█ The Court agrees with plaintiffs' assertion. Plaintiffs allege that defendants enter their homes without obtaining a warrant or consent to conduct non-emergency abuse investigations. These allegations implicate the right to be free from warrantless physical entries into the home, which the Supreme Court has recognized to be " 'the chief evil against which the wording of the Fourth Amendment is directed.' " *Payton v. New York,* 445 U.S. 573, 585–86, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (quoting *United States v. United States Dist. Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)).

It is well-established that "[w]arrantless searches inside a home are presumptively unreasonable." *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (citing *Payton,* 445 U.S. at 586, 100 S.Ct. 1371). Equally well-established, however, is the fact that exigent circumstances may exist which justify a warrantless entry into one's home. *See id.; Hurlman,* 927 F.2d at 79.

█ One such set of exigent circumstances is an officer's belief that a warrantless entry is necessary to protect or preserve life or avoid serious bodily injury. *See Mincey v. Arizona,* 437 U.S. 385,

392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (citations omitted); *Tenenbaum,* 193 F.3d at 604–05; *Tierney,* 133 F.3d at 196. In the context of a child abuse investigation, this exception to the warrant requirement permits the seizure of a child without a warrant or consent where officials " 'have reason to believe that life or limb is in immediate jeopardy.' " *Tenenbaum,* 193 F.3d at 605 (quoting *Good v. Dauphin County Soc. Servs. for Children and Youth,* 891 F.2d 1087, 1094 (3d Cir.1989)). In *Tenenbaum,* where the court was dealing with the removal of a child from his school without prior consent, the court held:

> where information possessed by a state officer would warrant a person of reasonable caution in the belief that a child is subject to the danger of abuse if not removed ... before court authorization can reasonable be obtained, the "exigent circumstances" doctrine ... permits removal of the child without a warrant equivalent and without parental consent.

*Id.* (citing *Hurlman,* 927 F.2d at 80). Although the *Tenenbaum* court was addressing a child's Fourth Amendment rights to be free from an unreasonable seizure, its analysis and reasoning apply with equal weight to parents' and guardians' assertion of Fourth Amendment rights. Absent exigent circumstances, such as to protect a child from imminent danger of abuse and neglect, officers may not enter the home without a warrant or consent.

■ In the present case, at least one plaintiff alleges that officers entered her home without a warrant or consent during the course of an abuse investigation.[18] It is defendants' contention that exigent circumstances justified the alleged warrantless entry. However, whether defendants have reason to believe that exigent circumstances exist before they enter plaintiffs' homes without a warrant and without consent is precisely what is at issue in this case. Because the Complaint can be liberally read to allege that no emergency circumstances existed to justify warrantless entries, and this allegation must be accepted as true for purposes of this motion, the Court finds that plaintiffs have stated a Fourth Amendment claim.[19]

### B. State Law Claims

Plaintiffs allege that defendants deprived them of their rights under various provisions of the New York State Constitution's Bill of Rights, and Article XVII, § 1 of the Constitution.[20] Defendants urge the Court to dismiss plaintiffs' state

---

18. Plaintiff Khatira Hikmah alleges that officers from the New York Police Department forced open her door without a warrant and despite her lack of consent, in order to gain entry for ACS workers. Complaint at ¶ 63.

19. Plaintiffs also assert a claim under the Ninth Amendment to the United State Constitution. This claim does not create a basis for recovery independent of plaintiffs' other claims because "the Ninth Amendment does not confer substantive rights in addition to those conferred by other provisions of our governing law." *Gibson v. Matthews,* 926 F.2d 532, 537 (6th Cir.1991); *accord United States v. Beatty,* 94 Cr. 631, 1996 WL 308677, at *4 (S.D.N.Y. June 7, 1996); *see also Doe v. Episcopal Soc. Servs.,* 94 Civ. 9171, 1996 WL 51191 (S.D.N.Y. Feb. 7, 1996) (granting motion to dismiss "[b]ecause § 1983 claims must be premised on specific constitutional guarantees, of which the Ninth Amendment provides none").

20. Plaintiffs allege that defendants have deprived them of their rights as "needy" persons secured under Article XVII, § 1 of the New York State Constitution. This provisions provides, "[t]he aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine." N.Y. CONST. art. XVII, § 1 (McKinney 1987). Defendants ask the Court to dismiss this claim because plaintiffs failed to allege that they are "needy." However, defendants raised this issue for the first time in their reply papers, thus depriving plaintiffs of an opportunity to respond. Therefore, the Court will not consider defendants' argument at this time. *See, e.g., Playboy Enters., Inc. v. Dumas,* 960 F.Supp. 710, 720 n. 7 (S.D.N.Y. 1997), *aff'd,* 159 F.3d 1347 (2d Cir.1998); *Thomas v. New York City,* 814 F.Supp. 1139, 1154–55 (E.D.N.Y.1993).

law claims on the grounds that plaintiffs have not complied with New York's notice-of-claims statute. *See* N.Y. GEN. MUN. LAW §§ 50–e, 50–i (McKinney 1999). Under this statute, a plaintiff must file notice of a claim which sounds in tort against a municipality within ninety days of when the claim arises. N.Y. GEN. MUN. LAW § 50–e(1)(a). Furthermore, the action must be commenced within one year and ninety days of when the claim arises. N.Y. GEN. MUN. LAW § 50–i(1)(c).

 New York courts have recognized that the notice-of-claims statute does not apply where the primary relief being sought is equitable in nature, and monetary damages are only incidental. *See, e.g., Serkil L.L.C. v. City of Troy*, 259 A.D.2d 920, 921, 686 N.Y.S.2d 892 (3d Dep't 1999); *see also Dutcher v. Town of Shandaken*, 97 A.D.2d 922, 923, 470 N.Y.S.2d 767 (3d Dep't 1983) ("[I]t is well settled that a notice of claim is not required for an action brought in equity against a municipality where the demand for money damages is incidental and subordinate to the requested injunctive relief.") (citations omitted).

 In determining whether plaintiffs primarily seek equitable or monetary

relief, the Court must "consider the complaint in the light of all its allegations and its full scope and purport." *Watts v. Town of Gardiner*, 90 A.D.2d 615, 615, 456 N.Y.S.2d 161 (3d Dep't 1982) (citations omitted). After reviewing the Complaint, the Court finds that the relief being sought in this case is primarily equitable in nature, and therefore, New York's notice-of-claims statute is inapplicable. Plaintiffs seek declaratory relief by asking this Court to enter a final judgment declaring the policies, practices, customs, and procedures of defendants to be in violation of various provisions of the New York State and federal Constitutions. *See* Complaint, Prayer for Relief, at ¶ D. They also ask the Court to permanently enjoin defendants from removing children in cases where there is no imminent danger to the child's health or welfare. *See id.* at ¶ E. It is true that plaintiffs also seek nominal and compensatory damages, *see id.* at ¶ F, but this request for relief is clearly incidental to the primary purpose of plaintiffs' action, which is to stop defendants from engaging in the challenged practices. Therefore, the Court denies defendants' motion to dismiss the state law claims on this ground.[21]

---

**21.** Defendants also raised a statute of limitations argument, contending that certain plaintiffs' claims which accrued more than three years prior to the filing of the Complaint are time-barred. The Court will not address this argument because defendants did not give adequate notice to plaintiffs that this was a basis for the motion to dismiss. Rule 7(b)(1), FED. R. CIV. P. requires that motions "state with particularity the grounds therefor." Rule 7 is designed " 'to afford notice of the grounds and prayer of the motion to both the court and the opposing party, providing that party with a meaningful opportunity to respond and the court with enough information to process the motion correctly.' " *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 760 (1st Cir.1996) (quoting *Registration Control Systems, Inc. v. Compusystems, Inc.*, 922 F.2d 805, 808 (Fed.Cir.1990)).

The statute of limitations argument was first raised in defendants' initial brief, confined to one sentence in the last line of an otherwise lengthy footnote. Unlike their mo-

tion to dismiss for failure to state a claim upon which relief can be granted, defendants did not put plaintiffs on notice of the statute of limitations argument by raising it in their notice of motion. *See supra* n. 16. Plaintiffs did not respond to defendants' argument in their response brief. Defendants then raised the argument again in their reply brief. The Court finds that plaintiffs' failure to respond is excusable due to the initial placement of the argument at the end of a footnote where it might have been overlooked. Because this issue was not briefed by both parties and plaintiffs may suffer substantial prejudice if the Court addresses this issue without giving plaintiffs the opportunity to respond, *see Cambridge Plating*, 85 F.3d at 760, the Court will refrain from considering the issue at this time. However, because a statute of limitations argument is an affirmative defense, defendants will not be precluded from raising it again in their answer. *See* Rule 8(c), FED. R. CIV. P.

.

## IV. Municipal Liability

Plaintiffs have named as defendants the City of New York, ACS, and both Mayor Giuliani and Commissioner Scoppetta in their official capacities. Because the individual defendants are sued only in their official capacities, the claims against all defendants are properly analyzed under a theory of municipal liability. *See, e.g., Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (stating that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent").

■ In *Monell*, the Supreme Court held that local governments are not wholly immune from suit under § 1983. *Id.* at 663, 98 S.Ct. 2018. They can be sued directly under § 1983 for monetary, declaratory, or injunctive relief, where the alleged unconstitutional action implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. *See, e.g., id.* at 690, 98 S.Ct. 2018; *Tenenbaum v. Williams*, 193 F.3d 581, 597 (2d Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1832, 146 L.Ed.2d 776 (2000); *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.1996). The Supreme Court also determined that municipalities may be held liable for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018.

■ Subsequent cases have interpreted *Monell* to mean that in order to state a claim for municipal liability under § 1983, plaintiffs must plead and eventually prove three elements: (1) that an official policy or custom is in place; (2) that there is a causal link between plaintiffs' alleged constitutional injury and the policy or custom; and (3) that plaintiffs in fact suffered a constitutional injury. *See Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir.1995) (citations omitted).

■ The Court finds that plaintiffs have pleaded municipal liability under § 1983. They mount a direct challenge to the "proclaimed policy" of ACS, an agency of the City of New York, under which ACS resolves any ambiguity regarding the safety of a child in favor of removal. *See* Complaint at ¶ 37. The causal link is established because, according to plaintiffs, it is this policy which has directly resulted in the various alleged constitutional deprivations. *See* Complaint at ¶ 39. Finally, the Court has already analyzed the various claims and determined that several of them state constitutional violations.

Plaintiffs need not plead more than this in order to survive defendants' *Monell* challenge. The Court agrees with the court in *Thomas v. New York City*, 814 F.Supp. 1139 (E.D.N.Y.1993), which stated in a similar context, "[a]t the pleading stage, civil rights litigants cannot be expected to be able to prove a pattern of misconduct in great detail." *Id.* at 1151. Therefore, the Court finds that defendants may be held liable under § 1983.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss pursuant to Rule 12(b)(1), FED. R. CIV. P., is denied and defendants' request that this Court abstain is also denied. Defendants' motion to dismiss pursuant to Rule 12(b)(6), FED. R. CIV. P., is granted in part and denied in part. The Court grants defendants' motion to dismiss as it applies to plaintiffs' religious discrimination claim. However, the Court denies their motion to dismiss plaintiffs' substantive and procedural due process claims, equal protection claim based on race, search and seizure claim, and state law claims. The parties are directed to confer and advise the Court on or before July 26, 2000 concerning their availability to attend a scheduling conference.

It is so ordered.